**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MARK ANTHONY POTTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 2:10-cv-0106** |
| **v.** | ) | **Judge Wiseman/ Knowles** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 16. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 21.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgement on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff protectively filed his application for Disability Insurance Benefits ("DIB") on February 15, 2008, alleging that he had been disabled since June 2, 2007, due to carpal tunnel syndrome, sleep apnea, back pain, hypertension, chronic obstructive pulmonary disease

1

("COPD"), and polycythemia. *See, e.g.,* Docket No. 11, Attachment ("TR"), pp. 9, 56, 59, 109-11, 127. Plaintiff's application was denied both initially (TR 52) and upon reconsideration (TR 57). Plaintiff subsequently requested (TR 60) and received (TR 73) a hearing. Plaintiff's hearing was conducted on February 22, 2010, by Administrative Law Judge ("ALJ") K. Dickson Grissom. TR 24. Plaintiff and vocational expert ("VE"), Anne B. Thomas, appeared and testified. *Id.*

On May 17, 2010, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 9-19. Specifically, the ALJ made the following findings of fact:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2008.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 2, 2007 through his date last insured of June 30, 2008 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following impairments, the combination of which was severe: *morbid obesity; chronic obstructive pulmonary disease with chronic tobacco abuse; obstructive sleep apnea; polycythemia vera; bilateral carpal tunnel syndrome; osteoarthritis of the left knee; lumbar spondylosis; and cervical spondylosis* (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform

*sedentary* work as defined in 20 CFR 404.1567(a) except that he was precluded from any climbing, stooping, bending at the waist to the floor, crouching, or crawling; precluded from any repetitive gross or fine manipulation with his right hand; precluded from any work around environmental pollutants such as dust, smoke, chemicals, fumes, or noxious gases; and precluded from any work around hazards such as dangerous or moving machinery or unprotected heights.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 6, 1962 and was 45 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated [*sic*] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 2, 2007, the alleged onset date, through June 30, 2008, the date last insured (20 CFR 404.1520(g)).

TR 11-19 (emphasis in original).

On June 8, 2010, Plaintiff timely filed a request for review of the hearing decision. TR

106. On September 20, 2010, the Appeals Council issued a letter declining to review the case

(TR 1-3), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record.  Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner

if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[1] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the

---

[1]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in: 1) failing to give proper weight to the opinion of Dr. Mark Hendrixson; 2) failing to consider all of the evidence; 3) failing to consider Plaintiff's subjective complaints of pain; 4) providing little or no analysis of numerous symptoms; 5) failing to properly analyze the impact of Plaintiff's "morbid/severe obesity" when determining his residual functional capacity; 6) improperly determining that Plaintiff's non-compliance with CPAP treatment was a major contributing factor to his sleep apnea; and 7) failing to find Plaintiff's testimony regarding his past employment credible. Docket No. 16-1. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Weight Accorded to the Treating Physician's Opinion

Plaintiff maintains that the ALJ did not accord appropriate weight to the opinion of Dr. Hendrixson, his treating physician. Docket No. 16-1. Specifically, Plaintiff argues that Dr. Hendrixson's evaluation of Plaintiff's restrictions regarding his ability to work were not overly restrictive. *Id.* Plaintiff contends that the that opinions of Dr. Hendrixson and the ALJ regarding Plaintiff's ability to work were, in fact, "essentially the same." *Id.* (emphasis omitted).

Defendant maintains that the ALJ properly discounted Dr. Hendrixson's opinion, because Dr. Hendrixson's opinion was inconsistent with other treatment notes and with the objective medical findings. Docket No. 21. Defendant also questions the materiality of Dr. Hendrixson's assessment of Plaintiff's functional limitations because these limitations were assessed nearly two years after Plaintiff's date last insured. *Id.* Defendant also argues that the limitations imposed by Dr. Hendrixson would preclude Plaintiff from all sedentary work, making such

limitations materially different and more restrictive than the limitations imposed by the ALJ. *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
>
> ...

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

On March 11, 2010, Plaintiff's treating physician, Dr. Hendrixson, completed a Medical Assessment of Ability to do Work-Related Activities (Physical) regarding Plaintiff. TR 216-18. In that assessment, Dr. Hendrixson opined that Plaintiff could lift a maximum of 5 pounds occasionally and 0 pounds frequently; could stand/walk for 90 minutes in an 8 hour workday, but could stand/walk for less than 10 minutes without interruption; could sit for less than 3 1/2 hours during an 8 hour workday, but could sit for less than 20-30 minutes without interruption; and could never climb, crouch, or crawl, but could occasionally kneel, stoop, or balance. *Id.* Dr. Hendrixson also opined that Plaintiff was limited in his ability to reach, feel, see, handle, push/pull, hear, and speak. *Id.* Finally, Dr. Hendrixson identified numerous environmental restrictions for Plaintiff. *Id.* Dr. Hendrixson cited Plaintiff's carpal tunnel syndrome, degenerative disc disease, and COPD as support for his opined restrictions. *Id.*

The Regulations provide that the ALJ could accord greater weight to Dr. Hendrixson's opinion than to other physician opinions, as long as his opinion was consistent with, and supported by, the evidence of record. The ALJ in the case at bar, however, chose not to do so, noting that Dr. Hendrixson's opinion contradicted other evidence in the record, including his own examination and treatment notes. TR 17. Specifically, the ALJ stated:

[T]he undersigned does not find the functional assessment of treating physician Mark Hendrixson, M.D. to be credible with regard to the claimant's ability to do work-related activities. His conclusions are inconsistent with his examinations and are not supported by the objective medical findings or treating progress notes of record. In fact, Dr. Hendrixson's assessment is needlessly over-restrictive. His conclusions are, at best, tenuous, patently sympathetic to the claimant's subjective complaints, and unsupported by the objective findings. Additionally, even if this were an accurate assessment of the claimant's limitations, it was clearly competed on March 11, 2010—well after the claimant's date last insured—and thus if of little or no utility in determining the claimant's limitations from the alleged onset date through the date last insured, nearly two years earlier. Despite the claimant's representative's citation of 20 CFR 404.1527, a treating physician's opinion must only be entitled to controlling weight when it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. Accordingly, as Dr. Hendrixson's opinion is inconsistent with the record as a whole, the undersigned does not accept his assessment.

TR 17, *citing* 20 CFR § 404.1527, SSR 96-2p, TR 214-18.

As noted above, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When there are contradictory opinions, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2). Because Dr. Hendrixon's opinion contradicted other evidence of record, the Regulations do not mandate that the ALJ accord his evaluation controlling weight.

Moreover, Defendant is correct that Dr. Hendrixson's March 11, 2010 assessment was rendered nearly two years after the date last insured. TR 218. As the ALJ explained, this timing

renders Dr. Hendixson's opinion "of little to no utility in determining the claimant's limitations from the alleged onset date through the date last insured," even if his assessment was an accurate reflection of Plaintiff's limitations in 2010. TR 17. Plaintiff's argument fails.

## 2. Consideration of Relevant Evidence

Plaintiff contends that the ALJ failed to properly consider all material medical evidence in his analysis. Docket No. 16-1. Specifically, Plaintiff contends that the ALJ did not appropriately consider the medical evidence contained in the first paragraph of his counsel's letter to the ALJ dated February 2, 2010.[2] *Id.* Plaintiff contends that the following updated treatment notes are material and were wrongly excluded from the ALJ's analysis: notes from Dr. Gnanaraj Joseph[3] dated January 19, 2010; notes from Dr. Dirk Davidson dated August 3, 2009, and December 1, 2008; notes from the Cumberland Heart Clinic dated July 8, 2009; and cardiac catheter treatment performed on August 11, 2008. *Id.* Plaintiff contends that these treatment notes contain the relevant findings of: severe obstructive sleep apnea with AHI of 25 per hour with significant oxygen desaturation; feelings of sleepiness and tiredness; Epworth sleepiness scale score of 9; a 16% reduction in REM sleep; poor exercise tolerance with the inability to return uphill from the mailbox without stopping; a habit of spending most of his day sitting or

---

[2]The first paragraph of this letter provides an overview of Plaintiff's age and education, the procedural posture of this case, and the alleged impairments. TR 199. As best the undersigned can discern, Plaintiff's statement of error refers to the *second* paragraph of the letter that discusses updated treatment notes. The undersigned will proceed to analyze the relevance of the material in the second paragraph which begins, "I have enclosed updated treatment notes . . ." TR 199.

[3]Plaintiff's letter (TR 199) and brief (Docket No. 16-1) refer to Dr. Joseph Gnanaraj. The undersigned notes, however, that the physician to whom Plaintiff refers is named Dr. Gnanaraj Joseph. *See, e.g.,* 346. This discrepancy is not, however, material to the issues before the Court.

lying down; chest pain and complaints of tiredness; anxiety attacks, leg edema; inability to lose weight; and ischemia at distal antero septum with a LEV of about 55%.  *Id.*

Defendant argues that these treatment notes were admitted to the Court's record on April 5, 2011, nearly one year after the ALJ rendered his decision.  Docket No. 21.  Defendant contends that is it insignificant that the ALJ did not explicitly mention these treatment notes in his decision because they are all dated after the date last insured and because they fail to support Plaintiff's application for disability benefits.  *Id.*

In addition to the letter dated February 2, 2010, discussed above, Plaintiff submitted a second letter to the Appeals Council dated June 7, 2010.  TR 107-08.  Plaintiff's second letter made identical claims to the first that the ALJ improperly evaluated the medical evidence noted above, and also cited additional medical evidence that he averred the ALJ failed to consider.  *Compare* TR 107-08 *with* TR 199-201.  The Appeals Council received Plaintiff's letter dated June 7, 2010, incorporated it into the record, and expressly considered the evidence presented therein.  TR 5.  Although it is not clear from the record whether the Appeals Council considered the February 2, 2010 letter, such omission would be harmless error, as the Appeals Council explicitly considered the June 7, 2010 letter, which included all of the claims in the February 2, 2010 letter before advancing new claims.  After considering the record as a whole, including the evidence contained in the June 7, 2010 letter, the Appeals Council nevertheless "found no reason under [its] rules to review the Administrative Law Judge's decision."  TR 1.

Because the Appeals Council expressly considered the medical evidence that Plaintiff cited in his letters and found no error in the ALJ's decision, the ALJ's determination must stand.  Accordingly, Plaintiff's argument fails.

### 3. Subjective Complaints of Pain

Plaintiff contends that the ALJ failed to properly consider his subjective complaints of pain. Docket No. 16-1. Specifically, Plaintiff asserts that the ALJ ignored his complaints that he suffered from a "constant" pain level of 8 out of 10 in his lower back, arm, and neck; back pain radiating into both legs; increased pain from standing, walking, and lifting, that improved with lying down; pain present 80% of the time while he is awake; chronic pain management; and recurrent chest pain. *Id.*

Defendant responds that the ALJ's decision shows that he carefully considered the medical evidence, thoroughly evaluated Plaintiff's impairments and symptoms, and properly evaluated Plaintiff's subjective complaints. Docket No. 21.

When discussing the evidence of record, the ALJ stated that, "[Plaintiff's] descriptions of the severity of his pain have at times been so extreme as to appear implausible." TR 13. It is within the ALJ's province to discount the credibility of Plaintiff's subjective allegations, and the Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating

symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").

When analyzing a claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the case at bar, the ALJ articulated an extensively detailed rationale for discounting Plaintiff's subjective allegations of pain. Specifically, the ALJ discussed the following regarding Plaintiff's credibility:

> After careful consideration of the evidence, the [ALJ] finds that the claimant's medically determinable impairments could reasonably be expected to cause *some* of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. In fact, the claimant's descriptions of the severity of his pain have at times been so extreme as to appear implausible. Furthermore, his descriptions of the symptoms have been atypical of the impairments documented by medical findings in this case and have been quite vague and general, lacking the specificity which might otherwise make them more convincing. For instance,

regarding his alleged pain, the claimant indistinctly stated in a *Pain Questionnaire* that it "seems like it[']s all over . . ."  When asked in another *Pain Questionnaire* when his pain began and when it first began to affect activities, he conveniently answered "when (he) [sic] signed up for disability."  In the interrogatories, when asked what it was about his mental or physical problems that prevented him from working, he incongruently answered, "Physical."  Similarly, when asked again what brings on his pain, he obscurely answered "my health."  In an appeals *Disability Report*, when asked about any changes for better or for worse in his conditions, he ambiguously alleged that his pain was "more severe."  Additionally, he has not provided convincing details regarding factors which precipitate or exacerbate the allegedly disabling symptoms, claiming that the symptoms are present "constantly" or all of the time.  For example, in *Pain Questionnaires*, he has declared that his pain is "constant" and that "any little thing" he does exacerbates his pain.

TR 13-14, *citing* TR 162, 185-86, 193, 203

The ALJ additionally noted that "[t]he claimant has not generally received the type of medical treatment one would expect for a totally disabled individual, which suggests that the symptoms may not have been as serious as has been alleged in connection with this application and appeal."  TR 16.  As can be seen, the ALJ's decision specifically addresses Plaintiff's subjective claims, and clearly articulates his rationale for discounting them.  TR 13-14, 16.  Although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on evidence that was inconsistent with Plaintiff's allegations.  This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination.  *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).  An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's

demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

The ALJ's rationale described above indicates that after assessing all the objective and testimonial evidence of record, the ALJ determined that Plaintiff's subjective complaints of pain were overly vague, implausible, and not entitled to credibility. TR 13-14. As has been noted, this determination is within the ALJ's province.

The ALJ observed Plaintiff during his hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

**4. Analysis of Other Symptoms**

Plaintiff also argues that the ALJ failed to properly analyze the following findings from Drs. Hendrixson and Baker: hypertension; carpal tunnel syndrome; COPD; sleep apnea; arthritis; polycythemia; cardiac stress test results; limited range of motion; leg problems including difficulty sitting, standing, and walking on his toes and heels; lumbar spondylosis and cervical spondylosis; severe right median nerve entrapment in the wrist; decreased functionality; and

prescriptions for Oxycontin and Xanax, as well as for a transcutaneous electrical nerve stimulation unit.  Docket No. 16-1.  Plaintiff also contends that the ALJ failed to properly analyze various symptoms that Sleep Centers of Tennessee and Cumberland Medical Center documented after the date last insured.  *Id.*

Defendant responds:

> Without articulating any alleged errors in the ALJ's decision, Plaintiff also broadly contends that the ALJ failed to properly consider certain enumerated symptoms and medical findings documented in the record (Plaintiff's Brief 7-9).  Plaintiff's contention lacks merit because, as the Sixth Circuit has recognized, "[i]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.

*Id.*, *citing McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).  Defendant argues that the ALJ is not required to cite to every piece of evidence in the record.  *Id.*, *citing Boseley v. Commissioner*, No. 09-6058, 2010 WL 3927043, at *4 (6th Cir. Sept. 30, 2010).  Defendant contends that even a cursory review of the ALJ's decision in the case at bar indicates that he carefully considered the medical evidence and thoroughly evaluated Plaintiff's impairments and symptoms.  *Id.*

Defendant is correct that the Sixth Circuit, in *McPherson v. Kelsey*, held that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  125 F.3d at 995-96, *quoting Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995).  Plaintiff's contention on this point is devoid of any supporting rationale or argumentation.  *See* Docket No. 16-1.  Because it is neither the Court's responsibility nor its

prerogative to make arguments for Plaintiff, the undersigned accordingly concludes that Plaintiff's statement that the ALJ failed to consider the enumerated findings from Drs. Hendrixon and Baker lacks sufficient "developed argumentation" to constitute a statement of error for purposes of reversal or remand.

Regarding the enumerated symptoms that Drs. Hendrixson and Baker documented before the date last insured, as discussed above in the first statement of error, the ALJ properly determined that Dr. Hendrixson's findings were not credible to the extent that they were inconsistent with objective evidence in the record. With regard to Dr. Baker, the ALJ thoroughly discussed his findings:

> In terms of the claimant's alleged bilateral carpal tunnel syndrome ("CTS"), consistent with a June 22, 2005 electromyelogram; on May 19, 2008, treating physician T. Scott Baker noted *moderate* CTS on the left and *severe* on the right, but there was no evidence of a focal neurologic deficit upon examination, and the claimant had still yet to undergo any surgery for this impairment despite his allegations of quite limiting pain and in spite of initial recommendations of surgical release nearly three years earlier. Curiously, the undersigned notes that subsequent impressions from Dr. Baker are near carbon copies of those in his May 2008 assessment. The severe right median nerve entrapment at the wrist was again confirmed by a June 16, 2008 nerve conduction study. The claimant apparently underwent left carpal tunnel release surgery on October 17, 2008, after the date last insured, but he indicated at the hearing that this surgery had been successful.
>
> As for the claimant's alleged lower back pain, while [Dr. Baker] recorded a diagnosis of lumbar spondylosis on May 19, 2008 subsequent to clinical impressions of tenderness, loss of range of motion, and positive straight leg raising bilaterally; [*sic*] the findings were otherwise atypical as they did not fit a specific dermatomal or myotomal pattern, and there was no evidence of a focal neurologic deficit. Also remarkably, Dr. Baker noted that the claimant was able to independently perform activities of daily living. Again, subsequent impressions from Dr. Baker are near carbon copies of those in his May 2008 assessment. A March 24,

2009 MRI of the lumbar spine revealed only *mild* degenerative disc changes at L4-5 with a *small* focal central posterior disc bulge at L5-S1. Even if this impairment would have had some effect on the claimant's ability to perform work-related activities, this particular objective evidence is dated after the date last insured and there is no evidence of any imaging prior thereto. At any rate, the assigned less-than-sedentary residual functional capacity is more than sufficient to address the limitations associated with this impairment, if any.

Regarding the claimant's alleged neck pain, while Dr. Baker recorded a diagnosis of cervical spondylosis May 19, 2008 subsequent to clinical impressions of tenderness and loss of range of motion; [sic] the findings were otherwise atypical as he noted that they did not fit any radicular pattern, and there was no evidence of neurologic defect. Once more, subsequent impressions from Dr. Baker are near carbon copies of those in his May 2008 assessment. Also, there is again no objective testing prior to the date last insured supportive of this impairment. In fact, a June 16, 2008 never conduction study revealed no electodiagnostic evidence of cervical radiculopathy.

While there is evidence of hypertension, at times perhaps under sub-optimal control, there is no evidence of end organ damage and no indication that more aggressive medication management, weight loss, diet modification, and/or exercise would not be more effective in controlling this condition. Furthermore, as of April 17, 2008, Dr. Hendrixson characterized this condition as "mostly controlled" and by August 27, 2007 it was noted as "controlled." Additionally, there is no evidence of hypertension-related complications . . . The claimant's hypertension, standing alone, is no more than a slight abnormality that had no more than a minimal effect on the claimant's ability to do basic physical or mental work activities prior to the date last insured. Accordingly, the [ALJ] finds that this condition was "non-severe."

TR 14-15, *citing* 257, 323, 338, 387, 389, 392-93, 395, 397, 399, 401, 403-04, 406-09, 411-12, 415-16.

Regarding Plaintiff's contention that the ALJ did not consider certain treatment records from Cumberland Medical Center, the ALJ specifically referenced the cardiac catherterization

treatment that Plaintiff received at Cumberland Medical Center on July 16, 2008, stating:

> The claimant's alleged chest pain in not a medically-determinable impairment prior to the date last insured. There is no evidence of any treatment for any cardiac impairment prior to the date last insured. The first indication of any alleged cardiac dysfunction is a cardiac catheterization dated July 16, 2008, and there were no remarkable findings noted.

TR 16, *citing* TR 383.

On November 21, 2011, Plaintiff attended Sleep Centers of Tennessee for a comprehensive polysomnogram; on December 4, 2008, Plaintiff returned for a PAP titration study. TR 350-53. With regard to Plaintiff's contention that the ALJ did not consider those records from Sleep Center of Tennessee, the ALJ stated:

> While the claimant does have a diagnosis of obstructive sleep apnea confirmed by polysomnography, the claimant not notably failed to use the CPAP machine properly or to use it consistently in spite of clinical notations that PAP therapy significantly reduced the claimant's respiratory disturbances during sleep.

TR 14, *citing* TR 244, 346, 353.

The ALJ's detailed analysis of Plaintiff's medical conditions and symptoms, both before and after the date last insured, is apparent through the quoted passages above. *See* TR 14-16. The record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ. *See* TR 14-16. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that Plaintiff has a residual functional capacity to perform limited sedentary work and was not otherwise disabled through the date last insured. TR 12-19.

Because the ALJ adequately considered Plaintiff's medical record as a whole, including

the conditions and symptoms Plaintiff enumerated above, the ALJ's decision stands.

## 5. The Effects of Obesity

Plaintiff argues that the ALJ failed to properly analyze the effects of his obesity. Docket No. 16-1. While Plaintiff concedes that the ALJ referenced Plaintiff's obesity in his decision, Plaintiff contends that the ALJ improperly failed to analyze the effects of his obesity on his residual functional capacity. *Id.* Specifically, Plaintiff maintains that the ALJ failed to question the VE about the effect of his obesity. *Id.*

Defendant responds that the ALJ properly considered Plaintiff's obesity. Docket No. 21. Defendant argues that the Social Security Rulings do not prescribe any procedural requirements for analyzing the effects of obesity on a claimant's residual functional capacity, such that there is no mandate that an ALJ question a VE specifically regarding a claimant's obesity. *Id.* Defendant additionally contends that Plaintiff failed to advance any evidence demonstrating how his weight adversely affects his other impairments or his ability to function. *Id.*

The applicable considerations that an ALJ must evaluate when determining the effect of obesity on residual functional capacity are clearly stated in SSR 02-1p:

> 8. How Do We Evaluate Obesity in Assessing Residual Functional Capacity in Adults and Functional Equivalence in Children?
>
> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.

An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone. ...

SSR 02-1p.

A plain reading of this SSR indicates that it does not prescribe a precise method of obesity analysis that must be followed. *Id.* Rather, the Ruling outlines various considerations to be weighed by the ALJ in the determination of the effects of a claimant's obesity on his/her residual functional capacity. *Id.*

As Plaintiff concedes, the ALJ in the case at bar acknowledged Plaintiff's obesity, stating: "In accordance with Social Security Ruling 02-1p, the undesigned has also considered the impact obesity has on limitation of function including the claimant's ability to perform routine movement and necessary physical activity within the working environment." TR 12

(emphasis omitted). As Plaintiff also concedes, the ALJ acknowledged that Plaintiff's Body

Mass Index ("BMI") was 49.1. TR 12. Regarding Plaintiff's BMI, the ALJ explained, "While

these levels describe the *extent* of the claimant's obesity, they do not correlate with any specific

degree of *functional loss*." TR 12, *citing* SSR 02-1p. The ALJ continued to explain his

conclusion that: "obesity contributes to the finding that the claimant has a combination of

impairments that are collectively '*severe*' as defined in the Regulations." TR 12-13.

The ALJ in the instant case analyzed the contributing effects of obesity on Plaintiff's

disability status and properly explained that, considering the factors of SSR 02-1p, the extent of

Plaintiff's obesity did not necessarily imply a functional limitation that would render him

disabled. TR 12-13.

Moreover, the hypothetical questions that the ALJ posed to the VE properly accounted

for Plaintiff's limitations:

> Q.     On the basis of the credible evidence, Ms. Thomas, I would
> like you to assume, first, that I would find [Plaintiff] to
> have demonstrated exertional impairments which would
> reflect the residual functional capacity for a range of light
> work. I would also, in the alternative, ask that you consider
> that I might find him with a sedentary RFC. Assume as
> well that I would find him to be precluded from any
> climbing, stooping, bending from the waist to the floor,
> crouching and crawling. I would ask you to assume that I
> would find him to be precluded from any repetitive gross or
> fine manipulation with his left hand—I'm sorry, with the
> right hand.
>
> Assume as well that he would be precluded from any work
> around environmental pollutants such as dust, smoke
> chemicals, fumes and noxious gases and he would be
> precluded from any work around hazards such as
> dangerous or moving machinery or unprotected heights. It
> would be somewhat asthmatic, he would not be able to
> return to his prior relevant work under those conditions,

under those limitations?

A.      Correct.

Q.      Would there be jobs in the area or in the several regions of the country that he might perform considering those restrictions and a hypothetical person of this claimant's younger age, high school education, and prior work?

A.      Just one brief question regarding repetitive use of the hands.  Does that mean—

Q.      Yes.

A.      —could not do constant gross and fine, gross or fine manipulation or what would the exact limitations [sic]?

Q.      I said no repetitive, as opposed to frequent, occasional. You can't do it just constantly.

A.      Okay.  So frequent would be appropriate?

Q.      Oh, yes.

A.      There would be examples at a light, unskilled level such as a hand packer.  There are 5,500 jobs in Tennessee.

Q.      A garment what?  What job?

A.      A hand packer.

Q.      A hand packer.

A.      There are 5,500 jobs in Tennessee—

Q.      Okay.

A.      —and 200,000 in the U.S.; a production laborer, there are 12,000 jobs in Tennessee, 360,000 in the U.S.; and a production assembler, there are 2,100 jobs in Tennessee and 470,000 in the U.S.

Q.      What about at the sedentary level?

A.      Yes.  Some examples would be a production assembler, there are 2,200 jobs in the Tennessee, 156,000 in the U.S. and a production laborer, there are 1,800 jobs in Tennessee and 58,000 in the U.S.

TR 43-45.

Plaintiff is correct that the ALJ did not specifically mention obesity in his questioning above.  However, the Sixth Circuit has continually held that hypothetical questions posed to a VE need not include a description of the claimant's every impairment.  *Webb v. Commissioner*, 368 F.3d 629, 631-33 (6th Cir. 2004). Rather, an ALJ's hypothetical question need only include the impairments and limitations he finds credible.  *See Cline v. Shalala*, 96 F.3d 146, 150 (6th Cir. 1996); *Stanley v. Secretary*, 39 F.3d 115, 118-19 (6th Cir. 1994); *Blancha v. Secretary*, 927 F.2d 228, 231 (6th Cir. 1990).

The ALJ in the case at bar was not required to mention Plaintiff's obesity in the hypothetical questions posed because the Plaintiff only subjectively asserted that his obesity contributed to his functional limitations.  As explained above, the ALJ properly discounted Plaintiff's credibility regarding his pain and symptoms and did not conclude that obesity provided the additional functional limitations that Plaintiff alleged.  This determination was within the ALJ's province.  Thus, the hypothetical questions posed in this case were proper.

Because the ALJ properly acknowledged and analyzed Plaintiff's obesity, and because the ALJ's hypothetical question to the VE were proper, Plaintiff's argument fails.

## 6. Treatment Program Compliance

Plaintiff maintains that his non-compliance with his continuous positive airway pressure ("CPAP") therapy was not a major contributing factor to his sleep apnea symptoms.  Docket No. 16-1.  As support for his assertion, Plaintiff argues that, even when he was in "an ideal hospital

type setting," he still experienced hypoxemia when undergoing bilevel positive airway pressure ("BiPAP") therapy.  *Id.*

Defendant responds that the ALJ correctly found that positive airway pressure ("PAP") therapy significantly reduced Plaintiff's sleep-related respiratory disturbances.  Docket No. 21. Defendant highlights Plaintiff's failure to take responsibility for his own health by continuing to smoke despite being repeatedly advised to quit and by acting against the advice of his treating physicians.  *Id.*, *citing* TR 14, 34, 296, 302, 308, 329.  Defendant also highlights Plaintiff's failure to use his CPAP and  BiPAP machines consistently as directed and his failure to maintain his BiPAP machine in working order.  *Id.*

The ALJ highlighted the following evidence that Plaintiff's non-compliance with his CPAP treatments contributed to his sleep apnea:

> [T]he claimant has notably failed to use the CPAP machine properly or to use it consistently in spite of clinical notations that PAP therapy significantly reduced the claimant's respiratory disturbances during sleep.  He reportedly failed to clean the machine for over a year and did not change his mask for a year. The humidifier was reportedly "very dirty," and the air filter in the humidifier was also "very dirty" and had not been changed for over a year.  The claimant has also apparently been significantly non-compliant with usage as the SmartCard revealed that he used the device for only six hours in seven days.  Entirely inconsistent with this well-documented non-compliance, the claimant testified under oath at the hearing that he had in fact been compliant.

TR 14, *citing* TR 244, 346, 353.

Although Plaintiff is correct that notes from Sleep Centers of Tennessee show that "Hypoxemia still occurred with BiPAP therapy" (TR 353), this does not discredit findings from the same source that PAP therapy significantly reduced his respiratory disturbances during sleep (*see id*).  As previously explained, the ALJ properly assessed treatment notes from Sleep Centers

of Tennessee, and the ALJ's analysis above details that Plaintiff's well-documented non-compliance notably interfered with the proper functioning of his CPAP machine, reducing its effectiveness.  TR 14.  Thus, substantial evidence supports the ALJ's determination that Plaintiff's non-compliance with PAP therapy contributed to his impairments and led the ALJ to conclude that Plaintiff exhibited "general unwillingness to take personal responsibility for his own health."  TR 14.

The ALJ considered the evidence of record, reached a reasoned decision, and clearly articulated the basis for his conclusions regarding the effects of Plaintiff's PAP therapy non-compliance.  The Regulations do not require more.  Plaintiff's argument fails.

### 7. Plaintiff's Employment

Plaintiff maintains that the ALJ improperly rejected his claim that he was employed in the concrete industry from 2000-2006 as non-credible and inconsistent with his earning records from 2002-2004.  Docket No. 16-1.  Specifically, Plaintiff contends that medical treatment notes dated April 8, 2003 and August 14, 2003, indicate that he maintained active employment in the concrete industry during that time.  *Id.*, *citing* TR 264-265.

Defendant offered no response on this issue.  Docket No. 21.

On April 8, 2003, and August 14, 2003, Dr. Davidson performed physical examinations of Plaintiff.  TR 264-65.  The treatments notes indicate, respectively, that Plaintiff "continues to be quite active working with concrete" (TR 265), and "continues to work in an office for a concrete company but states he is considering other employment options" (TR 264).  In contrast, the ALJ made the following determinations regarding Plaintiff's employment:

> A review of the claimant's *Certified Earning Record* shows that
> the claimant worked only sporadically prior to the alleged

> disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. In fact, he earned only $2706.69 in 2006 and had no earnings at all in 2007, despite his June 2007 alleged onset date. Additionally, entirely inconsistent with his *Work History Report* in which he reported that he had worked for Cumberland Concrete from 2000 to 2006; he had no earnings at all from 2002 through 2004.

TR 16, *citing* TR 123-25, 139-49.

As a preliminary matter, Dr. Davidson's notes regarding Plaintiff's employment are from interviews with Plaintiff at the time of the examinations, and are therefore only as credible as Plaintiff himself. As explained at length above, the ALJ properly discounted Plaintiff's credibility. These subjective reports cannot substitute for objective data regarding Plaintiff's employment status. The ALJ's rationale above shows that he thoroughly analyzed the objective data regarding Plaintiff's employment history and chose to rely on that data rather than Plaintiff's subjective remarks in making his determination. TR 16. As previously noted, this is within the ALJ's province.

Because the objective evidence regarding Plaintiff's employment suggests he was not steadily employed from 2000-2006 and because Plaintiff only advances subjective, non-credible evidence to the contrary, the ALJ properly discredited Plaintiff's employment testimony. Accordingly, Plaintiff's argument fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14)

days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


E. CLIFTON KNOWLES
United States Magistrate Judge